# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| PAMELA DOCKEN, | Civil No. 08-4952 (JRT/SRN) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| THE STATE OF MINNESOTA, | |
| Defendant. | |

Mark A. Greenman, **LAW OFFICE OF MARK A. GREENMAN**, 10 South Fifth Street, Suite 700, Minneapolis, MN 55402, for plaintiff.

Sarah A. McGee, Assistant Attorney General, **MINNESOTA ATTORNEY GENERAL'S OFFICE**, Bremer Tower, Suite 1100, 445 Minnesota Street, Saint Paul, MN 55101-2128, for defendant.

Plaintiff Pamela Docken ("Docken") brought this action against the State of Minnesota ("the State") for retaliation under the Family and Medical Leave Act when the State would not re-hire her after she resigned her position to care for an ill family member. Because Docken was never granted FMLA leave, and because there is no evidence that any action by the State was in retaliation for her request for FMLA leave or her subsequent lawsuit, the Court grants the State's motion for summary judgment.

# BACKGROUND

## I. DOCKEN'S EDUCATION AND EMPLOYMENT HISTORY WITH THE STATE OF MINNESOTA

Docken alleges that she has been repeatedly denied employment with the State because she previously brought a lawsuit against the State under the Family and Medical Leave Act ("FMLA"). Docken alleges that this conduct violates the FMLA.

Docken's resume details her education. (Decl. of Sarah McGee ("2nd McGee Decl.") Ex. B, Docket No. 28.) She has a Bachelor's Degree in Psychology with a minor in Criminal Justice from Metropolitan State University in St. Paul, Minnesota, and an Associate's Degree in Communications with a minor in Criminal Justice from Century College in White Bear Lake, Minnesota. Her resume indicates that she is presently enrolled in a masters program in Family and Marriage Counseling at the Alfred Adler Graduate School in Hopkins, Minnesota. (*Id.*) Docken's resume also includes an "Honors, Awards, and Special Accomplishments" section which states that she is a member of the PSI CHI National Honor Society, and that she received an award from the "Governor of the State of Minnesota for [her] work in the AED program." (*Id.*)

Docken was an employee of the State of Minnesota from 1991 through June 1999. She began working for the State's Office of the Ombudsman for Mental Health and Developmental Disabilities in 1991 as a receptionist, and later moved to a systems information position. (Deposition of Pamela Docken ("Docken Dep.") 18:23 – 19:5, Jan. 5, 2010, 2nd McGee Decl. Ex. A., Docket No. 28.)

In 1995, Docken left the Ombudsman's Office and went to work for the State's Department of Public Safety, Crime Victim Services ("CVS") Division as an "intermediate clerical" where she was involved in office management. (*Id.* at 25:1-15.) In 1998 Docken transferred to a grant administration position within the Department of Public Safety. (*Id.* at 29:21-24.) Docken understood this position to be temporary, and when it ended on or about July 1, 1999, Docken believed a position at CVS was available to which she could return. (*Id.* at 30:19 – 31: 25.) However, Docken's father suffered a stroke on or about July 1999, so Docken applied for FMLA leave to care for him. (*Id.* at 31:9-33:14.) Docken resigned when told her request for leave would be denied and she would be considered absent without leave ("AWOL") if she did not return to work. (*Id.* at 38:14-16.)

In 2001, Docken brought a lawsuit alleging that the State's conduct during her father's illness violated her rights under the FMLA. (Compl. ¶ 2, Docket No. 1.) After several of Docken's claims survived summary judgment (*see Docken v. Drucker, et al.*, Civ. No. 01-1106, Docket No. 32 (D. Minn. May 22, 2003)), the parties settled in September 2004. (Compl. ¶ 3, Docket No.1.)

Docken alleges that since "late 2005" she has "applied for over one hundred (100) positions at the State for which she was qualified." (*Id*. ¶ 6.) Docken states that she has been applying for positions with the State since she filed her lawsuit in 2001, but was not able to apply online until 2004. (Decl. of Pamela Docken ("Docken Decl.") ¶ 6, Docket No. 31.) She alleges that despite her "excellent employment record," she has received "no

response" from the State.  (Compl. ¶ 4-5, Docket No. 1.)  Docken alleges she has not been hired because she was "blackballed" when employment decision-makers learned of her previous FMLA lawsuit. (*Id.* ¶ 7.)

## II. STATE HIRING PROCEDURES

The State conducts its hiring through a centralized program known as "Resumix," but hiring decisions are made at the agency level.  (Multi-Source Recruitment and Selection Guidebook, Decl. of Sarah McGee ("1st McGee Dec.") Ex. A, Docket No. 5.) When hiring, State agencies first comply with any contractual requirements, including posting for bids and honoring obligations to candidates on "layoff lists."  (*Id.* at 6.)  If no contractual requirements apply, or the job remains vacant, an agency's human resource staff posts an advertisement on the Minnesota Department of Employee Relations ("DOER") website.  (*Id.* at 10.)  Job vacancies announced by the State include a description of the position, as well as the minimum and preferred qualifications for the position. (*Id.* at 7.)

Candidates for job vacancies create an online resume using DOER's website.  (*Id.*, Ex. B. at 4.)  Candidates may self-nominate or apply for a position online by following the directions to mark the appropriate spot on each job announcement for which they wish to be considered.  (Deposition of Judith A. Novotny ("Novotny Dep.") 4:25 – 5:22, Jan. 25, 2010, 2nd McGee Decl. Ex. D, Docket No. 28.)  Agency staff perform an initial screening of the resumes of applicants who self-nominate for jobs through the online Resumix database to determine whether the applicant meets the minimum qualifications

for the vacancy.  (*Id.* at 5:11-18.)  DOER or agency recruitment staff must conduct searches of the Resumix database for additional applicants who best meet the vacancy requirements, and those applicants are put on a track towards the vacancy.  (1st McGee Decl. Ex. A at 2.)

A list of candidates is given to the agency, which decides whether each applicant meets the minimum qualifications for a position.  (*Id.*)  If so, they become part of the applicant pool.  (*Id.* at 2-3.)  "*All applicants* who meet the minimum qualifications for a position become part of the 'applicant pool.'" (*Id.* at 3.)  "The agency may [then] choose to narrow the field and consider only those qualified applicants who are the **best** matches for a vacancy by also looking at the preferred qualifications. . . .  Those applicants who are considered the best matches comprise the 'finalist pool.'" (*Id.*)  Hiring supervisors and managers at the agency level may conduct additional job-related assessments to determine how far along each applicant should progress in the full selection process. (*Id.*)  At the conclusion of additional assessments, the hiring manager selects the best-qualified candidate.

Docken brought this action on August 18, 2008, alleging violations of the FMLA and a state law claim for negligent infliction of emotional distress.  (Compl. ¶¶ 8-14, Docket No. 1.)  Docken alleges that the State's FMLA violations were willful. (*Id*. ¶ 10.) The Court granted defendant's motion to dismiss the state law claim for negligent infliction of emotional distress, and denied defendant's motion to dismiss the claim under

the FMLA. (Order, Docket No. 15.) Defendant brought this motion for summary judgment on April 1, 2010. (Def.'s Mot. for Summ. J., Docket No. 25.)

## ANALYSIS

**I.     STANDARD OF REVIEW**

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences that can be drawn from those facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"To survive a motion for summary judgment, the nonmoving party must substantiate his allegations with sufficient probative evidence [that] would permit a finding in [his] favor based on more than mere speculation, conjecture, or fantasy." *Putman v. Unity Health Sys.*, 348 F.3d 732, 733-34 (8th Cir. 2003) (internal quotation marks removed). A district court "is not required to 'accept unreasonable inferences or sheer speculation as fact.'" *Reed v. City of St. Charles, Mo.*, 561 F.3d 788, 791 (8th Cir. 2009) (quoting *Howard v. Columbia Pub. Sch. Dist.*, 363 F.3d 797, 800 (8th Cir. 2004)); *see also Jones v. Wal-Mart Stores Inc.*, 306 Fed. Appx. 81, 83 (5th Cir. 2009)

("Conclusory allegations, speculation, and unsubstantiated assertions are inadequate to satisfy the [plaintiff's] burden.") (internal quotation marks omitted). When a plaintiff's evidence amounts only to allegations, unsupported by specific facts or evidence beyond plaintiff's own conclusions she cannot withstand a motion for summary judgment. *Reed*, 561 F.3d at 791.

## II.  FMLA

### A.  Standard to Evaluate a Claim under the FMLA

Under the FMLA, an eligible employee is entitled to twelve weeks of unpaid leave during any twelve-month period for any of several reasons, including the need to care for a parent if such "parent has a serious health condition." 29 U.S.C. § 2612(a)(1)(C). Employers are prohibited from "discriminat[ing] against any individual for opposing any practice" barred under the FMLA. *Id.* § 2615(a)(2). Docken brings a claim under § 2615(a)(2), arguing that the State has "blackball[ed]" her from further state employment in response to her 2001 lawsuit. (Compl. ¶ 9, Docket No. 1.)

The standard used in the Eighth Circuit for retaliation cases under the FMLA is the three-factor test articulated in *Smith v. Allen Health Sys. Inc.*, 302 F.3d 827, 832 (8th Cir. 2002). Plaintiffs seeking to assert claims under § 2615(a) like Docken[1] are considered to be asserting one of two types of claims: (1) a claim for interference with the exercise or attempt to exercise FMLA rights; or (2) a claim for retaliation which requires an

---

[1] "In this case, plaintiff is alleging an [29 U.S.C. § 2615] (a)(2) claim." (Pl.'s Opp'n at 7, Docket No. 30.)

employee to show that the employer discriminated against him for exercising his FMLA rights. *Wisbey v. City of Lincoln, Neb.*, 612 F.3d 667, 675 (8th Cir. 2010); *Seegert v. Monson Trucking, Inc.*, Civ. No. 09-699, 2010 WL 2132883, at *6 (D. Minn. May 27, 2010) (Montgomery, J.) (citing *Stallings v. Hussmann Corp.*, 447 F.3d 1041, 1050 (8th Cir. 2006)). This case is a retaliation action for discrimination, 29 U.S.C. § 2615(a)(2); and thus the Court utilizes the three-part *Smith* test.

## B. Inadmissible Evidence

"To be considered on summary judgment, documents must be authenticated by and attached to an affidavit made on personal knowledge setting forth such facts as would be admissible in evidence or a deposition that meets the requirements of Fed. R. Civ. P. 56(e)." *Shanklin v. Fitzgerald*, 397 F.3d 596, 602 (8th Cir. 2005) (quotation marks omitted). The Court cannot consider documents which do not meet those requirements. *Id.*

Mark Greenman, Docken's counsel, filed two declarations in this case, one supporting a memorandum in opposition to a motion to dismiss, the other supporting an opposition to a motion for summary judgment. (Decl. of Mark A. Greenman ("Greenman Decl."), Docket Nos. 9, 32.) Both sets of exhibits are identical. The full text of Greenman's declarations are as follows:

> 1. I am the attorney representing the plaintiff Pamela Docken in this lawsuit. Attached hereto as Exhibits A-E are true and correct copies of what they purport to be.

(Greenman Decl., Docket Nos. 9, 32.) The exhibits are (1) emails between Docken and Kathy Dohmeier; (2) an email from Docken to Michael Campion, which includes a partial list of jobs Docken applied for; (3) an email from Docken to Stephanie Glaser; and (4) a case from Westlaw that is not cited in Docken's memoranda.[2] Greenman's name appears at the top of one of the emails, as if the email between Docken and Campion was forwarded to him, but otherwise there is no suggestion that Greenman has personal knowledge of the exhibits. Docken's affidavit does not mention any of the exhibits.

Defendant's reply brief argues that Greenman improperly offered the exhibits, because he did not make the declaration on personal knowledge and the exhibits were not authenticated per the requirements of Rule 56(e). (Def.'s Reply at 4-5 n.1, Docket No. 34.)

The Court construes defendant's footnote as a motion to strike the unauthenticated evidence and grants the motion to strike the exhibits at docket number 32, because the exhibits were not properly authenticated or made on personal knowledge.

### C. *McDonnell-Douglas* Factors

There are two ways to prove an FMLA claim: through direct evidence of retaliation, or under the burden shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-806 (1973). *Phillips v. Mathews*, 547 F.3d 905, 912 (8th Cir. 2008). *McDonnell Douglas* sets forth a three part burden shifting test: (1) plaintiff must

---

[2] Exhibit D appears to be missing, or the sheet designating one of the pages as Exhibit D was omitted when the exhibits were filed.

produce evidence of a *prima facie* case of retaliation; (2) if plaintiff establishes a *prima facie* case, the employer must articulate a legitimate, non-retaliatory reason for the adverse action; and (3) the employee may show that the employer's proffered reason for the adverse action was a pretext for unlawful retaliation. *See McDonnell Douglas*, 411 U.S. at 802-06; *Humphries v. Pulaski Cnty. Special Sch. Dist.*, 580 F.3d 688, 692-93 (8th Cir. 2009). Because no direct evidence of FMLA retaliation has been alleged in this case, the Court uses the *McDonnell-Douglas* burden shifting framework in its analysis. *Phillips*, 547 F.3d at 912.

### 1. *Prima Facie* Case of Retaliation

To assert a *prima facie* case of retaliation, the plaintiff must produce evidence that: (1) she availed herself of a protected right under the FMLA; (2) she suffered an adverse employment decision; and (3) there is a causal connection between the protected activity and the adverse decision. *Smith*, 302 at 832; *see also Wisbey*, 612 F.3d at 676.

#### a. Causal Connection

"[A] causal connection . . . is a showing that an employer's retaliatory motive played a part in the adverse employment action." *Kipp v. Mo. Highway and Transp. Comm'n*, 280 F.3d 893, 897 (8th Cir. 2002) (internal quotation marks omitted). Motive can be proven by demonstrating (1) the employer had knowledge of the protected conduct, and (2) temporal proximity between the protected activity and the adverse action, though other factors can be used in evaluating intent. *Hervey v. County of*

*Koochiching*, 527 F.3d 711, 722 (8th Cir. 2008) ("An employee must show that the employer had actual or constructive knowledge of the protected activity in order to establish unlawful retaliation."); *Kipp*, 280 F.3d at 897 ("Here, the interval of **two months** between the complaint and [plaintiff's] termination . . . dilutes any inference of causation[.]"); *see also Takele v. Mayo Clinic*, 576 F.3d 834, 839-40 (8th Cir. 2009) (no causation where decision-maker knew plaintiff met with ombudsperson but was unaware that plaintiff complained of discrimination during the meeting); *Buettner v. Arch Coal Sales Co., Inc.*, 216 F.3d 707, 715 (8th Cir. 2000). An extended interval between the protected activity and the adverse action weakens the inference of retaliatory intent proportional to the amount of time elapsed. *Kipp*, 280 F.3d at 897.

### i. Employer's Knowledge of Protected Conduct

Defendant argues Docken cannot show that any agency decision-makers had actual or constructive knowledge of her prior FMLA suit at the time decisions were made not to hire her.[3]

Docken alleges that FMLA retaliation occurred against her in one of two ways: (1) that something improper was placed "in her record" so that agencies did not receive her

---

[3] Though not identified by Docken, Jeri Boisvert, the executive director of the Office of Justice Programs in the Minnesota Department of Safety, testified that she was "aware of the [FMLA] lawsuit, but not the particulars or the outcome . . . I don't recall any conversation about the lawsuit[.]" (Deposition of Jeri Boisvert ("Boisvert Dep.") 5:5-13, Jan. 27, 2010, 2nd McGee Decl. Ex. C., Docket No. 28.) Boisvert, however, also testified that by the time she became aware of Docken's application to her department, "the interviews had been completed and an offer . . . had been made." (*Id.* at 5:18-25.)

job applications from DOER; or (2) that the agencies she applied to knew of her prior request for FMLA leave and subsequent suit and did not hire her because of them.

Docken alleges that there may be "marks" within the State's computer system that kept her from being hired. (Docken Dep. 57:7-16; Docket No. 28 ("My theory is that my resume never made it past [DOER] to the agencies that I definitely know would have considered hiring me.").) In her deposition, Docken admits she has no facts suggesting a mark against her, has not seen a copy of her personnel file, and has not been told that anything negative is in her personnel file. (*Id.* at 55:19-20, 60:3-4, 73:19-25.) Docken also alleges that she was placed on a "do-not-hire" list, but offers only "her suspicions" that one exists, and that "when [s]he first initially started working with the State there was a do-not-hire list" which she did not see, but was told about. (*Id.* at 90:16-24.)

Defendant points to the lack of facts averred by Docken, as well as Docken's unsubstantiated "suspicions" that she has been "blackballed" as insufficient to create a genuine issue of material fact. Defendant also points to depositions of current State employees who testified they have no knowledge of a do-not-hire list, and would not consider such a list in their employment decisions. (Def.'s Mot. for Summ. J. at 17, Docket No. 27; Depositions of Kathleen Dohmeier 15:1-3 Jan 25, 2010 (Ex. E), Brian Relay ("Relay Dep.") 6:19-22, Jan. 27, 2010 (Ex. G), Boisvert Dep. 7:15-19 (Ex. C), Novotny Dep. 7:21-23 (Ex. D), 2nd McGee Decl., Docket No. 28.) Further, defendant notes that at least one decision-maker, Brian Relay, did receive her resume but declined to hire her because "this particular group of applications just had people that had

exceptional qualification. So, we didn't need to go down as far as [Docken]." (Relay Dep. 6:13-18.) Defendant also refers to the Court's denial of its motion to dismiss that allowed discovery and depositions to be taken, which, defendant alleges, resulted in no evidence that Docken was "blackballed." The discovery and deposition also "revealed that Docken was not always the most qualified applicant for the positions she applied to." (Def.'s Mot. for Summ. J. at 19, Docket No. 27; *see also* Relay Dep. 6:13-18; Boisvert Dep. 7:3-12.)

Though Docken may have been qualified for some of the jobs to which she applied, there is no evidence that any employment decision-maker took Docken's request for FMLA leave, or FMLA lawsuit into account when making a hiring decision, nor that a "do-not-hire" or "blackball" list exists or that anyone relied on such a list when deciding not to hire her.

On repeated questioning by defendant, Docken stated she had no facts or proof that any person in a position to hire her had any knowledge of her FMLA suit.[4]

---

[4] The following are representative of Docken's exchanges with defendant:

Q: So during this time period [while Docken was applying for positions with the State of Minnesota after settling her FMLA suit] is there a person at the state that you're accusing of having retaliatory intent?

A: I'm accusing the state. Not any one particular person.

Q: So are you saying there's something in the computer system that marks you?

A: I don't know. I don't have an answer for that. There's something that marks me but I don't know what it is.

(Docken Dep. 58:2-11, Docket No. 28.)

(Footnote continued on next page.)

(Footnote continued.)

>  Q: Do you know who the decision-maker was for the Board of Animal Health [an agency Docken applied to]?
>
>  A: I have no idea.
>
>  Q: Do you have any reason to believe that the decision-maker . . . knew about your prior lawsuit[?]
>
>  A: There was a good possibility through DOER, yes.
>
>  Q: And what facts do you base that on?
>
>  A: It's my opinion.

(*Id.* at 64:13-21.)

>  Q: Do you know who the decision-maker was for the Arts Board?
>
>  A: No.
>
>  Q: Do you have any reason to believe that the decision-maker . . . knew you'd filed an FMLA lawsuit in the past?
>
>  A: I believe, but don't have the facts, that they could have been notified . . . that I filed[.]

(*Id.* at 68:2-10.)

>  Q: Do you have any reason to believe that the decision-maker at the Behavioral Health and Therapy Board knew about your FMLA lawsuit?
>
>  A: I suspect.
>
>  Q: But you have no facts?
>
>  A: I have no facts.

(*Id.* at 77:23 – 78:3.)

Docken testified similarly with respect to her applications for employment with the Departments of Commerce, Corrections, Education, Employee Relations, Employment and Economic Development, Finance, Health, Human Rights, Human Services, Labor, Natural Resources, Revenue, Transportation, Minnesota Housing Finance Agency, Minnesota Judicial Branch, Minnesota Lottery Board, Minnesota Zoo, Minnesota State Colleges and Universities, Office of the Ombudsman for Mental Health and Developmental Disabilities and the Teachers Retirement Association. (*See generally id.*)

During her deposition, Docken speculated that there may have been communication between "someone" at DOER and any of the agencies to which she applied, but she has offered no evidence in support of her theory. For example:

> A: Again, as I said before, I cannot – I can't prove it, but I do believe that there could have been a contact from DOER saying, you know, she sued the state, she got a settlement, you know, we really don't want to have her back, she's trouble. I don't know.
>
> Q: But you have no facts to support that?
>
> A: Yeah, I definitely don't have any facts, 'cause I've said it several times.

(Docken Dep. 69:16-24, Docket No. 28.)

Docken has not addressed causality in her reply brief, relying instead on an improper analysis under Title VII. (*See generally* Pl.'s Opp'n, Docket No. 30.) She failed to allege any facts, beyond the opinions and suspicions contained in her affidavit and deposition testimony, that any decision-maker was aware of her FMLA suit and took the suit into account when making an employment decision.[5] Even viewing the facts in the light most favorable to Docken, no evidence has been introduced establishing a causal relationship between her failure to obtain a position with the State and her FMLA suit and settlement.

---

[5] Review of the inadmissible evidence does not reveal any additional facts that, if properly submitted, would create a genuine issue of material fact. Docken's interpretation of the documents is strained at best, and nothing directly suggests the necessary causal connection.

### ii. Temporal Proximity Between the Protected Activity and the Adverse Action

"The length of time between protected activity and adverse action is important." *Smith*, 302 F.3d at 833. "The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be very close." *Id.* (quoting *Clark County Sch. Dist.*, 532 U.S. at 273); *see also Shanklin*, 397 F.3d at 604 (8th Cir. 2005) (finding causal nexus interference evaporates after a ten-month gap between protected conduct and discharge); *Kipp*, 280 F.3d at 897 (interval of two months between complaint and termination "so dilutes any inference of causation that . . . the temporal connection could not justify a finding of [a causal link].").

Docken requested FMLA leave in June 1999, and resigned in July without the leave being granted. (Docken Dep. 33:12-24.) The parties disagree about when the alleged adverse actions began. Defendant states that "six years elapsed between [Docken's] request for FMLA leave and the start of the alleged adverse actions." (Def.'s Mot. for Summ. J. at 14, Docket No. 27.) Defendant argues that such a time-span does not meet the "very close" timing supportive of a casual connection.

Docken avers in her declaration that she "applied for positions with the state of Minnesota on a continual basis since [she] filed [her] lawsuit. It was not until 2004 that

[she] was able to apply on line."[6] (Docken Decl. ¶ 6, Docket No. 10.) Docken's first FMLA suit was filed on June 21, 2001. (*Docken v. Drucker, et al.*, Civ. No. 01-1106, Docket No. 1 (D. Minn. June 21, 2001).) Because the exact date of Docken's resignation from employment with the State is not clear, the Court considers the time of her resignation to be July 1999, when Docken says she began working for the City of Minneapolis. (Docken Dep. 40:13-15.) Even viewing the facts in this way, nearly twenty-four months passed between Docken's request for leave and resignation, and when she began applying for, and not getting, jobs with the State. This span of time dampens any inference of a causal connection. *See Smith*, 302 F.3d at 833; *Shanklin*, 397 F.3d at 604; *Kipp*, 280 F.3d at 897.

Docken also suggests that the relevant protected activity is the *filing* of her FMLA lawsuit in 2001, not her request to take leave under the FMLA in 1999. Even if 2001 was the date of the protected activity, no evidence (beyond Docken's unsupported statement) has been adduced suggesting that any adverse action took place before at least 2005 when she was able to apply to positions online.

Absent admissible evidence or testimony from anyone other than Docken to the contrary, the Court finds that there is no genuine issue of material fact that a causal connection existed between Docken's failure to be hired and her FMLA lawsuit.

---

[6] The inadmissible evidence submitted by Greenman includes a listing of "Previous Postings I Applied To Online," and shows October 7, 2005, as the first date on which a position she applied to was posted.

### b. Adverse Employment Action and Availment of a Protected Right under FMLA

Because there is insufficient evidence to raise a genuine issue of material fact for causation, the Court need not reach the question of whether Docken suffered an adverse employment action or availed herself of a protected right under the FMLA.

### 2. Remaining *McDonnell Douglas Analysis*

Because the Court finds that no genuine issues of material fact have been raised to support a *prima facie* case of retaliation, the burden does not shift to defendant to prove a legitimate non-discriminatory reason for failing to hire Docken, nor is there any reason to evaluate whether the legitimate reasons offered by defendant are a pretext. *See McDonnell Douglas*, 411 U.S. at 802-06.

### ORDER

Based on the foregoing of all the records, files, and proceedings herein, **IT IS HEREBY ORDERED** that Defendant State of Minnesota's Motion for Summary Judgment [Docket No. 25] is **GRANTED**.

**IT IS FURTHER HEREBY ORDERED** that the Exhibits A-E attached to the Declaration of Mark A. Greenman are **STRICKEN** [Docket No. 32].

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED: February 1, 2011  
at Minneapolis, Minnesota.

\_\_\_\_s/ John R. Tunheim\_\_\_\_  
JOHN R. TUNHEIM  
United States District Judge